IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DUBUQUE DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

   vs.                          No. CR23-1008-LTS

JASON LAUFENBERG,            TRANSCRIPT OF
                              DETENTION HEARING

       Defendant.
_____/


       The Detention Hearing held before the Honorable
Mark A. Roberts, Magistrate Judge of the United States
District Court for the Northern District of Iowa, at the
Federal Courthouse, 111 Seventh Avenue Southeast, Cedar
Rapids, Iowa, June 21, 2023, commencing at 1:30 p.m.


APPEARANCES

For the Plaintiff:    DEVRA HAKE, ESQ.
                    Assistant United States Attorney
                    111 Seventh Avenue Southeast
                    Cedar Rapids, IA 52401

For the Defendant:    MATTHEW LOUIS NOEL, ESQ.
                    The Noel Law Office
                    1610 Garfield Avenue
                    Dubuque, IA 52201

Also present:        Amy Moser, U.S. Probation

Transcribed from     Shelly Semmler, RDR, CRR
digital recording by: 320 Sixth Street
                    Sioux City, IA 51101
                    (712) 233-3846

Contact Shelly Semmler at 712-233-3846 or ssemmlerreporting@gmail.com
Reproduction of this transcript is prohibited without authorization of the transcriber.
Case 2:23-cr-01008-LTS-MAR   Document 20-2   Filed 07/05/23   Page 1 of 49

```
 1        (The following transcript was prepared from an audio
 2    recording.)
 3                            * * * *
 4                    P R O C E E D I N G S
 5            THE COURT:  Please be seated.  Case now before
 6    the Court is the United States versus Jason Laufenberg,
 7    Number 23-CR-1008.  The United States is represented by
 8    Assistant United States Attorney Devra Hake.  The
 9    defendant is here in person with Attorney Matt Noel.  The
10    matter comes on for a detention hearing.
11        Is the government ready to proceed?
12            MS. HAKE:  Yes, Your Honor.
13            THE COURT:  Is the defense ready to proceed?
14            MR. NOEL:  Yes, Your Honor.
15            THE COURT:  At this stage it is the
16    government's burden, Ms. Hake, and you may proceed.
17            MS. HAKE:  Thank you, Your Honor.  First the
18    United States proffers the pretrial services report filed
19    at docket 14.
20            THE COURT:  Any objection?
21            MR. NOEL:  No objection, Your Honor.
22            THE COURT:  I'll let the parties know that I
23    have reviewed it in detail, and at this point I will take
24    formal notice of the pretrial services report.
25            MS. HAKE:  Thank you, Your Honor.  Next the
```

Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com
No purchase of a private copy of this transcript.
Case 2:23-cr-01008-LTS-MAR  Document 30-2  Filed 07/05/23  Page 2 of 49

1    United States calls Dan Kearney.

2            THE COURT:  Mr. Kearney, if you can come

3    forward please, and before you take a seat, if I could

4    ask you to please stop and raise your right hand.

5            DAN KEARNEY, PLAINTIFF'S WITNESS, SWORN

6            THE COURT:  Please be seated.  And when you're

7    comfortable, I'd ask you to please adjust that microphone

8    so we can be sure we hear you and record you.

9        Ms. Hake?

10            MS. HAKE:  Thank you, Your Honor.

11                     DIRECT EXAMINATION

12    BY MS. HAKE:

13    Q.    What is your name?

14    A.    Dan Kearney.

15    Q.    What is your occupation?

16    A.    Deputy sheriff, Dubuque County Sheriff's Office.

17    Q.    Are you a case agent involved in the investigation

18    into the defendant here, Jason Laufenberg?

19    A.    Yes.

20    Q.    Can you give a brief overview of law enfor -- law

21    enforcement's investigation related to the defendant,

22    Jacob Demaio, Codi Demaio, Matthew Birch, and others?

23    A.    Yes.  In 2019 the drug task force in Dubuque along

24    with the DEA, excuse me, out of Cedar Rapids started an

25    investigation involving Jake Demaio, Codi Demaio, Jason

*Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com*
*Reproduction of this transcript prohibited*
Case 2:23-cr-01008-LTS-MAR   Document 20-2   Filed 07/05/23   Page 3 of 49

1    Laufenberg, and Matt Birch.  It's a federal

2    methamphetamine case that was led by Jacob Demaio who was

3    getting source methamphetamine from Mexican organization

4    out of California.

5    Q.    Do you know where Matthew Birch is currently?

6    A.    He is in federal custody, in prison.

7    Q.    Are there pending federal conspiracy cases against

8    Jacob Demaio and Codi Demaio right now?

9    A.    Yes.

10   Q.    And are those pending cases involving the same time

11   period as the case against the defendant here?

12   A.    Yes.

13   Q.    Did a confidential informant tell law enforcement

14   that he sold methamphetamine to the defendant starting in

15   early 2019?

16   A.    Yes.

17   Q.    What did the confidential informant say about that?

18   A.    The informant said for -- at a span of over six

19   months between two to three -- I'm sorry, about once a

20   month he had sold at least 30 pounds of meth to

21   Mr. Laufenberg.

22   Q.    Is that 30 pounds each time or 30 pounds altogether?

23   A.    Yes, 30 pounds each time.

24   Q.    Did another confidential informant tell law

25   enforcement that in July of 2019 Jacob Demaio put at

*Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com*
*Reproduction of this transcript is prohibited without authorization*
Case 2:23-cr-01008-LTS-MAR   Document 20-2   Filed 07/05/23   Page 4 of 49

```
 1   least two pounds of methamphetamine inside a stroller and
 2   other baby items and left that methamphetamine at the
 3   confidential informant's residence in Dubuque?
 4   A.    Yes.
 5   Q.    And were those items including the methamphetamine
 6   all intended for the defendant?
 7   A.    Yes.
 8   Q.    And did the defendant, in fact, take the
 9   methamphetamine that Jacob Demaio had left him?
10   A.    Yes.
11   Q.    Did law enforcement determine based on multiple
12   statements by confidential informants that in August of
13   2019 defendant located an abandoned residence in Dubuque,
14   Iowa?
15   A.    Yes.
16   Q.    And did defendant tell Jacob Demaio that Demaio
17   could get methamphetamine shipped to that abandoned
18   residence?
19   A.    Yes.
20   Q.    On or about August 28, 2019, pursuant to a search
21   warrant, did the United States Postal Inspection Service
22   seize and open a package mailed to that address?
23   A.    Yes.
24   Q.    And was the package then analyzed by the postal
25   inspection laboratory services?
```

*Contact Shelly Semmler at 712-233-3840 or ssemmlerreporting@gmail.com*
*Reproduction of this transcript prohibited without authorization*
Case 2:23-cr-01008-LTS-MAR Document 20-2 Filed 07/05/23 Page 5 of 49

1  A.    Yes.

2  Q.    And did the laboratory determine that the package

3  contained a total of approximately 1,700 grams of actual

4  pure methamphetamine?

5  A.    Yes.

6  Q.    What is a typical user quantity of methamphetamine?

7  A.    A user quantity per day could be anywhere from a

8  half gram up to three grams a day.

9  Q.    The amount found in the package, based on your

10  training and experience, is that consistent with user

11  quantity or drug trafficking?

12  A.    Drug trafficking.

13  Q.    Why do you say that?

14  A.    Getting that large of a quantity of methamphetamine

15  at one time in the way it was packaged in individual or

16  one-pound packages is a clear indication of drug resale.

17  Q.    Also in August of 2019, did the United States Postal

18  Inspection Service seize and open another package that

19  was mailed to the abandoned residence?

20  A.    Yes.

21  Q.    And this is the same residence that defendant had

22  previously identified for Jacob Demaio?

23  A.    Yes.

24  Q.    Did the postal service forensic laboratory services

25  then examine that package and determine that it contained

*Contact Shelly Semmler at 712-233-3846 or ssemmlerreporting@gmail.com*
*No purchase a complete copy of the transcript.*
Case 2:23-cr-01008-LTS-MAR   Document 202   Filed 07/05/23   Page 6 of 49

1  a total of, again, approximately 1,700 grams of actual

2  pure methamphetamine?

3  A.    Yes.

4  Q.    On or about December 15 of 2019, did Dubuque Police

5  Department officers traffic stop defendant's vehicle?

6  A.    Yes.

7  Q.    Was Codi Demaio driving the vehicle, and was she the

8  sole occupant at the time?

9  A.    Yes.

10  Q.    When she saw law enforcement, did she throw a

11  methamphetamine pipe out the window?

12  A.    Yes.

13  Q.    Later did officers search the car and in the

14  backseat find about 11 grams of methamphetamine?

15  A.    Yes.

16  Q.    Did they also find marijuana in the center console

17  of the car?

18  A.    Yes.

19  Q.    Did a confidential informant tell law enforcement

20  that they sold methamphetamine to the defendant between

21  2019 and 2020?

22  A.    Yes.

23  Q.    And did that confidential informant say they sold at

24  least 25 pounds of methamphetamine to the defendant?

25  A.    Yes.

*Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com*
*Reproduction is prohibited without permission of the transcriber.*

Case 2:23-cr-01008-LTS-MAR   Document 20-2   Filed 07/05/23   Page 7 of 49

1  Q.   In 2020, did defendant begin sourcing another

2  confidential informant with methamphetamine?

3  A.   Yes.

4  Q.   And did this confidential informant buy at least one

5  pound of methamphetamine from the defendant?

6  A.   Yes.

7  Q.   Did the confidential informant give defendant the

8  confidential informant's motorcycle to pay off a drug

9  debt that the confidential informant had?

10  A.   Yes.

11  Q.   Did the defendant tell this confidential informant

12  that defendant was getting 80 pounds of methamphetamine

13  from Jacob Demaio?

14  A.   Yes.

15  Q.   In February of 2020, did defendant and Codi Demaio

16  obtain approximately 30 pounds of methamphetamine?

17  A.   Yes.

18  Q.   Did this occur while Jacob Demaio was in jail?

19  A.   Yes.

20  Q.   And did defendant and Codi Demaio then sell that 30

21  pounds of methamphetamine to Jacob Demaio's usual drug

22  customers?

23  A.   Yes.

24  Q.   After Jacob Demaio was released from jail in 2020,

25  did he reach out to people in Dubuque to source more

Contact Shelly Semmler at 712-233-3846 or ssemmlerreporting@gmail.com
Reproduction outside of this case is not authorized
Case 2:23-cr-01008-LTS-MAR Document 20-2 Filed 07/05/23 Page 8 of 49

1  methamphetamine?

2  A.    Yes.

3  Q.    Did the defendant here provide Codi Demaio with

4  about $25,000 and send her to California to buy more

5  drugs?

6  A.    Yes.

7  Q.    And was that approximately $25,000 -- were those

8  funds drug proceeds or intended to further drug

9  trafficking?

10  A.    Yes.

11  Q.    Did Codi Demaio take that money and then go to

12  Las Vegas and lose all of the money?

13  A.    Correct.

14  Q.    In 2020 did defendant drop off money at one of Jacob

15  Demaio's stash houses that was operated by a confidential

16  informant?

17  A.    Yes.

18  Q.    And was that money for Jacob Demaio in exchange for

19  methamphetamine?

20  A.    Yes.

21  Q.    Would defendant drop off stacks of cash with varied

22  amounts like $6,000, $10,000, $13,000, $20,000 or even

23  $40,000?

24  A.    Yes.

25  Q.    Would the defendant sometimes give the confidential

Contact Shelly Semmler at 712-253-3841 or ssemmlerreporting@gmail.com
Reproduction without written consent of the transcriber prohibited
Case 2:23-cr-01008-LTS-MAR Document 30-2 Filed 07/05/23 Page 9 of 49

1  informant an ounce of methamphetamine for handling the

2  transaction?

3  A.    Yes.

4  Q.    In total did defendant drop off at least $300,000

5  for Jacob Demaio?

6  A.    Yes.

7  Q.    And was defendant buying pounds of methamphetamine

8  from Jacob Demaio for about $3,500 per pound?

9  A.    Yes.

10  Q.    So now this is conduct mostly involving 2019 and

11  2020; is that fair to say?

12  A.    Yes.

13  Q.    Was the defendant known by drug task force

14  individuals or other law enforcement to be involved in

15  drug trafficking before 2019?

16  A.    Yes.

17  Q.    Tell me about that.

18  A.    In 2016 the defendant was involved.  His name had

19  come up in a federal case called Ice Pirates which was

20  prosecuted through this district.  The defendant was

21  showing up at a target house on the case.

22  Q.    Does law enforcement have information about what the

23  defendant has been doing since 2020, 2021?

24  A.    No.  The defendant was also I shouldn't say directly

25  involved but kind of involved in another federal case

Contact Shelly Semmler at 712-233-3846 or ssemmlerreporting@gmail.com
Case 2:23-cr-01008-LTS-MAR   Document 20-1   Filed 07/05/23   Page 10 of 49
Rough Draft Complete Copy of Transcript

```
1   prosecuted through this office in 2018, and then we also
2   heard the defendant was involved in a case in Jo Daviess
3   County, Illinois, where search warrants were conducted at
4   a house for a drug investigation.
5   Q.   When were those search warrants conducted?
6   A.   I know the one was -- or maybe -- maybe one for sure
7   was in 2021, in the fall of 2021.
8   Q.   Do you know what officers found when they searched
9   the house in fall of 2021?
10  A.   I believe some narcotics were there,
11  methamphetamine, but I believe the defendant was living
12  in the garage behind the residence at the time.
13         MS. HAKE:  I have no further questions for this
14  witness.
15         THE COURT:  Thank you, Miss Hake.
16     Mr. Noel?
17         MR. NOEL:  Thank you, Your Honor.
18                  CROSS-EXAMINATION
19  BY MR. NOEL:
20  Q.   I want to make sure I understand your testimony,
21  Deputy Kearney.  Are you saying that you have not heard
22  the defendant's name mentioned in any investigation since
23  the fall of 2021?
24  A.   Yes, that is -- that is correct.
25  Q.   Okay.  And this instance you talked about in
```

```
 1  Jo Daviess County, the house was not searched.  He was
 2  not living in the house.  He was living in the garage
 3  behind it; is that correct?
 4  A.    Yeah, according to the reports from East Dubuque.
 5  Q.    Okay.  And he was never charged with anything over
 6  there, never prosecuted, nothing like that.
 7  A.    I don't believe so, no.
 8  Q.    Okay.  Are you aware -- or strike that.
 9        When was the first time you met with the defendant
10  as to this investigation?
11  A.    I believe -- I'm not sure when it was.  I know where
12  it was.  I can't recall the exact date.
13  Q.    Are you aware that he received a target letter from
14  the United States Attorney's Office?
15  A.    Yes.
16  Q.    Was it before or after he received that target
17  letter?
18  A.    It was before.
19  Q.    Okay.  When the defendant met with you; correct?
20  A.    Yeah, yeah.  Actually I met him at Menards, yes.
21  Q.    Between that time and the time he got arrested which
22  was last week, you met with the defendant several times;
23  correct?
24  A.    I met him when I provided him the target letter and
25  one other time with his prior attorney, yes.
```

*Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com*
*To purchase a complete copy of this transcript*
Case 2:23-cr-01008-LTS-MAR   Document 20-2   Filed 07/05/23   Page 12 of 49

1  Q.   Okay.  So the defendant's been aware of this

2  prosecution for at least five months; is that a correct

3  statement?

4  A.   Oh, for sure, yes.

5  Q.   At any time did you have any reports, any

6  information that he was not going to meet with law

7  enforcement?

8  A.   No.

9  Q.   Any time during that period that he was going to run

10 or take off?  Did you have any concerns about that?

11 A.   No.

12      MR. NOEL:  Thank you, Your Honor.  I have no

13 further questions.

14      THE COURT:  Thank you, Mr. Noel.

15   Miss Hake, anything further?

16      MS. HAKE:  No, Your Honor.

17      THE COURT:  All right.  Thank you, officer.

18 You may be excused.

19      THE WITNESS:  Thank you.

20      THE COURT:  Miss Hake, do you have any

21 additional evidence or a proffer you'd like to make?

22      MS. HAKE:  No, Your Honor.

23      THE COURT:  And, Mr. Noel, do you have any

24 evidence or a proffer this afternoon?

25      MR. NOEL:  Yeah, Your Honor.  At this time we

*Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com*
*Produced using computer-aided transcription*
Case 2:23-cr-01008-LTS-MAR  Document 20-2  Filed 07/05/23  Page 13 of 49

```
1   would call Debbie Laufenberg to the stand.
2           THE COURT:  Ms. Laufenberg, if you could come
3   forward through those gates.  And I think you saw where
4   our last witness was seated.  And before you sit down,
5   I'm going to ask you to stop and raise your right hand.
6        DEBBIE LAUFENBERG, DEFENDANT'S WITNESS, SWORN
7           THE COURT:  Please watch your step.  And when
8   you're seated, I'm going to ask you to make sure you're
9   talking into the microphone so that we can be sure to
10  hear you and record you.
11      Mr. Noel?
12          MR. NOEL:  Thank you, Your Honor.
13                  DIRECT EXAMINATION
14  BY MR. NOEL:
15  Q.  Miss Laufenberg, how do you know my client, Jason
16  Laufenberg?
17  A.  Jason is my son.
18  Q.  And where do you currently reside?
19  A.  6 -- 63 -- I don't know my address.  In La Motte.
20  Q.  In La Motte, Iowa; correct?
21  A.  Yeah.
22  Q.  And La Motte, Iowa, is in Jackson County in Iowa;
23  correct?
24  A.  Yes.
25  Q.  During the past week, you've become aware that Jason
```

Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com
Case 2:23-cr-01008-LTS-MAR    Document 20-2    Filed 07/05/23    Page 14 of 49
Reproduction without permission of this transcript prohibited

```
1   was in trouble; correct?
2   A.    Yes.
3   Q.    And you were contacted by federal probation asking
4   if -- if it would be okay if Jason would live with you.
5   Is that a correct statement?
6   A.    Yes.
7   Q.    How do you feel about that?
8   A.    That's every -- that's fine with me.  I'd love to
9   have him.
10  Q.    Was there a issue about guns being at your
11  residence?
12  A.    There was, but they're gone now.
13  Q.    Can you tell the Court what happened to the guns?
14  A.    My boyfriend that I live with took them to his
15  brother's.
16  Q.    So there are no firearms at your residence at this
17  time.
18  A.    Nothing.
19  Q.    Now, one of the requirements the Court may impose
20  under the statute is that you have custody of Jason which
21  means if he were to violate his conditions of release in
22  any way you would be obligated to report that to the
23  Court or to his probation officer.  Are you willing to do
24  that?
25  A.    Yes.
```

*Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com*
*to purchase a complete copy of this transcript*

Case 2:23-cr-01008-LTS-MAR Document 20-2 Filed 07/05/23 Page 15 of 49

```
1    Q.   Okay.
2             MR. NOEL:   Thank you, Your Honor.  I have no
3    further questions.
4             THE COURT:   Thank you, Mr. Noel.
5        Miss Hake?
6             MS. HAKE:   Thank you, Your Honor.
7                         CROSS-EXAMINATION
8    BY MS. HAKE:
9    Q.   Good afternoon, Miss Laufenberg.
10   A.   Hi.
11   Q.   What do you know about your son's drug use?
12   A.   I mean, I just know that he's done drugs in the
13   past.  I try not to ask too many questions.  The little I
14   know the better.
15   Q.   When did he start using methamphetamine?
16   A.   I -- I don't -- I couldn't tell you that.
17   Q.   Is he still using methamphetamine?
18   A.   I don't know.
19   Q.   When did he start using cocaine?
20   A.   I don't know.
21   Q.   Do you know whether he's consumed alcohol?
22   A.   Yeah.  Not in the last probably five years or . . .
23   Q.   Do you know of any other drugs that the defendant
24   has consumed?
25   A.   No.
```

*Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com*
*to purchase a complete copy of the transcript.*
Case 2:23-cr-01008-LTS-MAR  Document 20-2  Filed 07/05/23  Page 16 of 49

```
 1   Q.   Do you have information about whether your son ever

 2   sold drugs?

 3   A.   I don't know.

 4   Q.   Were you talking with him in 2019?

 5   A.   Yes.

 6   Q.   Did he ever mention selling drugs at that point?

 7   A.   No.

 8   Q.   Were you talking with him in 2020?

 9   A.   Yeah.

10   Q.   Did he ever mention selling drugs?

11   A.   No.

12   Q.   You didn't know if he was using drugs at this point;

13   right?

14   A.   Yeah.

15   Q.   Is it a surprise to you that you're here today about

16   a drug case?

17   A.   No.

18   Q.   Why do you say that?

19   A.   You just hear things from other people or rumors.

20   Q.   What do you hear?

21   A.   Just about what's going on or who's doing what or --

22   I try not to involve myself in that.  I don't, you

23   know . . .

24   Q.   Have you ever met Jacob Demaio?

25   A.   No.
```

*Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com*
*to purchase a complete copy of this transcript.*
Case 2:23-cr-01008-LTS-MAR   Document 202-2   Filed 07/05/23   Page 17 of 49

```
1    Q.    Have you ever heard of Jacob Demaio before today?

2    A.    Yeah.

3    Q.    What did you hear about him?

4    A.    Well, he used to gamble over in East Dubuque at

5    Nancy's, a gambling place over there.

6    Q.    How did you --

7    A.    My girlfriend works there.  He would walk in, and

8    she'd say, well, that's, you know, Jake Demaio.  If he

9    stood in front of me I couldn't tell you what he -- who

10   he is.

11   Q.    Do you know anything else about Jacob Demaio?

12   A.    No.

13   Q.    Before today had you ever heard about Codi Demaio?

14   A.    Probably the same as Jacob, yeah, I mean.  I don't

15   know her either.

16   Q.    When you say the same, what do you mean?

17   A.    You know, you just hear things, you know.  I

18   don't -- I mean, I don't know.

19   Q.    Did you hear that she was involved with drugs?

20   A.    No, I don't think so.

21   Q.    Had you ever heard of Matthew Birch before today?

22   A.    Yeah.

23   Q.    What did you hear about him?

24   A.    I don't know what I heard about him, I mean.  I'm

25   not sure what you're asking.  I guess I don't know.
```

*Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com*
*to purchase a complete copy of the transcript.*
Case 2:23-cr-01008-LTS-MAR   Document 202-2   Filed 07/05/23   Page 18 of 49

```
 1    Q.    Did you know Matthew Birch existed before today?

 2    A.    Yeah.

 3    Q.    How did you know that?

 4    A.    My girlfriend, it's her cousin, and I would go down

 5    to her house, and then he'd stop in once in a while

 6    and . . .

 7    Q.    Did you know whether he used drugs?

 8    A.    I did not know that, no.

 9    Q.    Did you know about your son selling him drugs?

10    A.    No.

11    Q.    Do you know what your -- whether your son has had a

12    job in the last few years?

13    A.    Yeah.

14    Q.    Tell me about that.

15    A.    He's worked for construction company.  He helps

16    people out, do odd jobs and things.

17    Q.    Is it your understanding that he's -- let me ask,

18    how many hours a week is it your understanding that he

19    works?

20    A.    He works from, like, morning till late at night.

21    Q.    Every day?

22    A.    Yeah.

23    Q.    Do you know where your son was staying before he was

24    arrested?

25    A.    Yes.
```

*Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com*
*to purchase a complete copy of this transcript*

Case 2:23-cr-01008-LTS-MAR   Document 39-2   Filed 07/05/23   Page 19 of 49

```
1   Q.    Had you been there before?

2   A.    Yes.

3   Q.    How often had you been there?

4   A.    Oh, maybe two or three times.

5   Q.    Have you ever seen your son use drugs?

6   A.    No.

7   Q.    Have you ever seen him appear intoxicated?

8   A.    No.

9   Q.    Have you ever seen him appear under the influence in

10  any way?

11  A.    No.

12  Q.    Are you aware of the defendant's criminal history?

13  A.    Yes.

14  Q.    So what's your understanding of his criminal

15  history?

16  A.    I don't remember things real well, so it's been a

17  few years.  Maybe a burglary or I'm not sure on that

18  either.

19  Q.    Other than this burglary, any other criminal history

20  convictions you can think of?

21  A.    No.

22  Q.    Has he ever gone to jail?

23  A.    Yeah, once.

24  Q.    Do you know why he went to jail?

25  A.    What year or . . .
```

*Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com*
*to purchase a complete copy of this transcript.*

Case 2:23-cr-01008-LTS-MAR Document 20-2 Filed 07/05/23 Page 20 of 49

```
1   Q.   Why?
2   A.   Oh, why?  I think it might have something to do with
3   the burglary or -- I don't remember things real well.
4   Q.   So it would be your plan to have the defendant live
5   with you; is that right?
6   A.   Yes.
7   Q.   Do you work?
8   A.   No, I'm retired.
9   Q.   What about your boyfriend?  Does he work?
10  A.   He's retired.
11  Q.   Does your boyfriend have a history of drug use?
12  A.   No.
13  Q.   All right.
14           MS. HAKE:  Nothing further.
15           THE COURT:  Thank you, Ms. Hake.
16       Mr. Noel?
17           MR. NOEL:  Very briefly, Your Honor.
18                    REDIRECT EXAMINATION
19  BY MR. NOEL:
20  Q.   Miss Laufenberg, you know how your son acts
21  normally; correct?
22  A.   Yeah.
23  Q.   So do you think you'd be able to tell if he was
24  under the influence of a substance?
25  A.   I think so.
```

*Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com*
*Reproduction without permission of the transcriber*

Case 2:23-cr-01008-LTS-MAR   Document 209-1   Filed 07/05/23   Page 21 of 49

```
 1  Q.   Okay.  And then lastly, Jason does construction.
 2  It's a lot of outside work; correct?
 3  A.   Uh-huh.
 4  Q.   You have to say yes or no.
 5  A.   Yes.  I'm sorry.
 6  Q.   So in the summertime he's busier than he is in the
 7  wintertime; is that a correct statement?
 8  A.   Yes.
 9  Q.   And he works long hours in the summer.
10  A.   Yes.
11  Q.   Okay.
12          MR. NOEL:  Nothing further, Your Honor.
13          THE COURT:  Thank you, Mr. Noel.
14       Ms. Hake?
15          MS. HAKE:  Nothing further.
16          THE COURT:  Ms. Laufenberg, how long have you
17  lived in La Motte?
18          THE WITNESS:  Ten years, ten -- right around
19  ten years.
20          THE COURT:  Okay.  I take it your son Jason
21  lived with you when he was growing up; is that correct?
22          THE WITNESS:  Yes.
23          THE COURT:  Where was that?
24          THE WITNESS:  In St. Donatus.
25          THE COURT:  When was the last time he would
```

Case 2:23-cr-01008-LTS-MAR   Document 202-2   Filed 07/05/23   Page 22 of 49

```
1    have lived with you?

2            THE WITNESS:  Would have been probably -- well,

3    two years ago he was working for -- I can't even think of

4    the name of the construction, but they were repaving the

5    road, the gravel road, that was right down the road from

6    our house.  So he stayed there because it was just close

7    to work.  He stayed there for about eight weeks while

8    they finished the road.

9            THE COURT:  Other than that, when was the last

10   time that his home would have been -- your home would

11   have been his personal residence?  Would that have been

12   in high school, something like that?

13           THE WITNESS:  Yeah, right, yeah.

14           THE COURT:  Okay.

15           THE WITNESS:  Yeah.

16           THE COURT:  Has he lived with you at all there

17   in La Motte, just the time --

18           THE WITNESS:  Yes.

19           THE COURT:  That eight weeks?

20           THE WITNESS:  To do that construction project

21   that they . . .

22           THE COURT:  Who else lives at that residence?

23   Just your boyfriend, Mr. Goin?

24           THE WITNESS:  Yes.

25           THE COURT:  All right.  Thank you.  Those are
```

Case 2:23-cr-01008-LTS-MAR   Document 202-1   Filed 07/05/23   Page 23 of 49

1  all the questions I have.  You may be excused.

2          THE WITNESS:  Thank you.

3          THE COURT:  That means you can leave or you can

4  stay for the rest of our hearing in the back of the

5  courtroom.

6      Mr. Noel, did you have any evidence or a proffer

7  you'd like to make?

8          MR. NOEL:  We have another witness, Your Honor.

9  We'd call Mark Scholtes to the stand.

10         THE COURT:  Mr. Scholtes, before you sit down,

11  could I ask you to please stop and raise your right hand.

12         MARK SCHOLTES, DEFENDANT'S WITNESS, SWORN

13         THE COURT:  Please be seated.  And I think I

14  can spell your first name, but can you tell us how you

15  spell your last name.

16         THE WITNESS:  S-c-h-o-l-t-e-s.

17         THE COURT:  Very well.  Thank you.

18      Mr. Noel?

19         MR. NOEL:  Thank you, Your Honor.

20                    DIRECT EXAMINATION

21  BY MR. NOEL:

22  Q.  And actually for the record, your full name is Mark

23  Scholtes Junior; correct?

24  A.  The Second.

25  Q.  The Second.  How do you know my client, Jason

*Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com*
*to purchase a complete copy of the transcript.*
Case 2:23-cr-01008-LTS-MAR   Document 202   Filed 07/05/23   Page 24 of 49

1  Laufenberg?

2  A.    He's an employee of mine.

3  Q.    How long has he worked for you?

4  A.    On and off for the last few years.

5  Q.    Okay.  What kind of work does he do for you?

6  A.    Construction, excavating, waterproofing, and

7  concrete.

8  Q.    Okay.  And he is currently employed by you; is that

9  correct?

10  A.    Correct.

11  Q.    If Mr. Laufenberg were released today pending his

12  trial in this matter, does he still have a job with you?

13  A.    Absolutely.

14  Q.    Okay.  And is it your wish that he come back and

15  work for you?

16  A.    Yeah, we need him back.

17  Q.    Is there currently a project that he bid that you're

18  hoping he can at least partake in before the culmination

19  of these proceedings?

20  A.    Yeah.  Before his arrest we took on a pretty big

21  job, so we definitely need him back to finish it.

22  Q.    Do you have any concerns that Jason would not come

23  to work for you or not show up for work because of these

24  proceedings?

25  A.    No.  He'll be there every day.

```
 1   Q.   Did you know that there was this potential criminal

 2   case out there before his arrest last week?

 3   A.   Just that he possibly was getting arrested.

 4   Q.   Okay.  Did you know that it involved drugs?

 5   A.   I didn't really get into it --

 6   Q.   Okay.

 7   A.   -- too detail.

 8   Q.   Have you ever seen Mr. Laufenberg use drugs?

 9   A.   No.

10   Q.   Do you have any concerns that he uses drugs?

11   A.   No.

12   Q.   On a construction site, it's pretty important that

13   nobody's under the influence; correct?

14   A.   Yeah.

15   Q.   If he were under the influence, would he be working

16   for you currently?

17   A.   No.

18          MR. NOEL:  Thank you, Your Honor.  No further

19   questions.

20          THE COURT:  Thank you, Mr. Noel.

21       Miss Hake?

22          MS. HAKE:  Thank you, Your Honor.

23                    CROSS-EXAMINATION

24   BY MS. HAKE:

25   Q.   Good afternoon, sir.  You mentioned that the
```

*Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com*
*to purchase a complete copy of this transcript*

Case 2:23-cr-01008-LTS-MAR   Document 20-2   Filed 07/05/23   Page 26 of 49

1 defendant worked for you off and on.  Do you recall that?

2 A.   Yeah.

3 Q.   Tell me what you meant by that.

4 A.   He's helped us on a few different projects, and just

5 within, like, the last three, four months, he's been

6 pretty much full time helping us.

7 Q.   Why did he have those off periods?

8 A.   Other jobs.  He was doing concrete and other stuff.

9 Q.   You had other jobs or he had other --

10 A.   He did.

11 Q.   So would it be that he was a -- he just didn't show

12 up or he told you in advance?

13 A.   Subcontractor.

14 Q.   So he would just be busy.  Is that what you're

15 saying?

16 A.   Correct, yeah.  If we need him for, like, a big

17 pour, an excavation job, he would come help us.

18 Q.   But sometimes he wouldn't be able to.

19 A.   If he was working his other job, correct.

20 Q.   Did you ever -- excuse me.  Did you ever have issues

21 with him not showing up?

22 A.   No.

23 Q.   Any issues with him showing up late?

24 A.   Can't get him to leave the job site till it's done.

25 Q.   Did anything you heard today make you question

Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com
Please order a complete copy of this transcript
Case 2:23-cr-01008-LTS-MAR   Document 202-2   Filed 07/05/23   Page 27 of 49

```
 1   keeping him on your workforce?
 2   A.   No.  We've never had issues with him.
 3          MS. HAKE:  Nothing further.
 4          THE COURT:  Thank you, Ms. Hake.
 5      Mr. Noel?
 6          MR. NOEL:  Nothing further, Your Honor.
 7          THE COURT:  Mr. Scholtes, I know some employers
 8   have some drug testing programs.  Does your company have
 9   that?
10          THE WITNESS:  No, not unless we get, like, an
11   OSHA violation.
12          THE COURT:  And what's your company called?
13          THE WITNESS:  Ground Up Construction out of
14   Dubuque, Iowa.
15          THE COURT:  And what sort of contracting work
16   do you do?
17          THE WITNESS:  We do a lot of roofing, siding,
18   excavating, waterproofing.
19          THE COURT:  Okay.
20          THE WITNESS:  And currently building a new
21   house so . . .
22          THE COURT:  Fair to say that's mostly
23   seasonal -- seasonal work and you don't provide work for
24   people like Mr. Laufenberg during the winter, or do
25   you --
```

```
 1              THE WITNESS:  We do do plowing and snow removal
 2    as well.
 3              THE COURT:  Does he do that for you?
 4              THE WITNESS:  He can.
 5              THE COURT:  I mean has he I should have asked.
 6              THE WITNESS:  No.
 7              THE COURT:  Okay.  Those are all the questions
 8    I have for you.  You may be excused.
 9         Mr. Noel, do you have any additional evidence or a
10    proffer?
11              MR. NOEL:  I have one more witness, Your Honor.
12    I would call Wendy Figueroa to the stand.
13              THE COURT:  Miss Figueroa, if you could come
14    forward, and before you take a seat, if I could ask you
15    to stop and raise your right hand.
16          WENDY FIGUEROA, DEFENDANT'S WITNESS, SWORN
17              THE COURT:  Please be seated.  Watch your step.
18    And when you're seated, if I could ask you to make sure
19    you're speaking directly into our microphone.  And then
20    if I could ask you to spell your name for us.
21              THE WITNESS:  F-i-g-u-e-r-o-a.
22              THE COURT:  Thank you.
23         Mr. Noel?
24              MR. NOEL:  Thank you, Your Honor.
25                        DIRECT EXAMINATION
```

Case 2:23-cr-01008-LTS-MAR Document 202 Filed 07/05/23 Page 29 of 49

BY MR. NOEL:

Q.   Miss Figueroa, how do you know my client?

A.   My husband, Phil Jensen, is an attorney in Dubuque
and -- well, in Illinois also.  And he has -- every once
in a while people will come and help us do things, and so
I met him through a friend of ours.  And Jason came, and
we've kept him.

Q.   So Jason does odds and ends for you and your
husband; is that correct?

A.   Oh, it's not odds and ends.  It's dropping 40-foot
trees.  He's gone up to our second home in Wisconsin and
has -- has taken down 40-foot trees by the handfuls.
He's done major repair work at our house.  When --
probably when he's not working for Ground Up, he's
probably at one of our houses doing things.

Q.   How long have you known Mr. Laufenberg?

A.   I think -- is it a couple years now, going on a
couple years?

Q.   Okay.  And would you say that in addition to working
for you and doing jobs for you that you're also personal
friends with Mr. Laufenberg?

A.   I've come to love him.

Q.   Did you know that there were issues with
Mr. Laufenberg and this potential criminal action before
he was arrested last week?

```
1  A.   He had told me briefly about it, so it didn't take
2  me by surprise.
3  Q.   Okay.  So he was open and honest with you that
4  the --
5  A.   Oh, yeah, yeah.
6  Q.   Okay.
7  A.   We have a 16-year-old son, and he just wanted us to
8  know, you know, about him so it didn't come as a shock.
9  Q.   Okay.  And you said that your husband is an attorney
10 in Iowa and Illinois; correct?  And your husband's name
11 is Phil Jensen; is that correct?
12 A.   Yes.  I'm sorry.
13 Q.   You're -- you probably don't know this, but
14 yesterday in an interview Mr. Laufenberg identified you
15 as Wendy Jensen.  Is that what you usually go by?
16 A.   I do.  My legal name is still Figueroa.  Jason
17 wouldn't know that.  It's my professional name.  I've
18 been doing my -- I'm in -- a vice president in human
19 resources, so I just didn't change my name when Phil and
20 I got married.
21 Q.   Where do you currently work?
22 A.   I work for Coforge.  It's a technical company.
23 Q.   Okay.  And where is it located?
24 A.   New Jersey.
25 Q.   Okay.  But you work out of Dubuque, Iowa; correct?
```

```
 1   A.    I work out of my home, correct.

 2   Q.    Okay.  And you reside in Dubuque; correct?

 3   A.    I reside in Dubuque.

 4   Q.    Okay.  And as a matter of fact, before this, this

 5   hearing, you made an offer to Jason; is that correct?

 6   A.    I made it several times, yes.

 7   Q.    Okay.  And what was that offer?

 8   A.    That I'll take him home with me.

 9   Q.    Okay.  And if for some reason the Court felt that

10   Miss Laufenberg wasn't appropriate but felt that you

11   were, would you take on the obligations that I explained

12   to Miss Laufenberg?

13   A.    Hundred percent.

14   Q.    Okay.  And your husband, you said he's an attorney.

15   He used to be an assistant state's attorney in Jo Daviess

16   County; is that correct?

17   A.    Yes.

18   Q.    And is he aware that you would undertake this favor

19   for Mr. Laufenberg?

20   A.    I called him before I walked in here, yeah.

21   Q.    Okay.  And is he, for lack of a better term, onboard

22   with that plan?

23   A.    Yes, he is.

24   Q.    Okay.  And even if Mr. Laufenberg doesn't end up

25   residing with you, would you still have work for him to
```

*Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com*
*To purchase a complete copy of this transcript*
Case 2:23-cr-01008-LTS-MAR   Document 20-2   Filed 07/05/23   Page 32 of 49

1  do and plan on seeing him during his release?

2  A.    Absolutely.

3  Q.    Okay.

4         MR. NOEL:  Thank you, Your Honor.  I have no

5  further questions.

6         THE COURT:  Thank you, Mr. Noel.

7     Ms. Hake?

8         MS. HAKE:  Thank you, Your Honor.

9                   CROSS-EXAMINATION

10 BY MS. HAKE:

11 Q.    Does the defendant sometimes travel to your cabin in

12 Wisconsin?

13 A.    He does.

14 Q.    Tell me about that.

15 A.    So we have a log home in Egg Harbor, Wisconsin, and

16 he and Michael will come up and take down trees that

17 nobody in Door County's able to because the trees are in

18 such close proximity to the house that we don't trust

19 anyone else to do it.

20 Q.    How often has the defendant made that trip up to

21 Wisconsin?

22 A.    Two or three times in the past -- in the past few

23 months.

24 Q.    Are you aware of the defendant's history with drugs?

25 A.    Not really, no.

```
1    Q.    Are you aware that he has a history of
2    methamphetamine use?
3    A.    No.
4    Q.    Are you aware that he has a history of cocaine use?
5    A.    No.
6    Q.    Has he ever talked to you about drug use?
7    A.    You know, I think in a past conversation he had
8    mentioned it being in his past.  But quite honestly, I
9    have a bull crap detector, and if he would have sat in
10   front of me in the past couple years on something -- and
11   I've seen it frequently -- I'd see it, and I wouldn't be
12   sitting here today.
13   Q.    Are you a trained substance abuse counselor?
14   A.    No, but I've got six sisters who are addicts, and I
15   think I'm pretty well trained just through life.
16   Q.    Methamphetamine addicts?
17   A.    Two of them are, yeah.
18   Q.    Are you aware of the defendant's history of selling
19   drugs?
20   A.    No.
21   Q.    Has he ever talked with you about that?
22   A.    He opened up a little bit about what was going on.
23   He didn't say whether he did or not.  He just told me a
24   little bit about the charges.  So prior to that I had no
25   knowledge.
```

Case 2:23-cr-01008-LTS-MAR   Document 20-2   Filed 07/05/23   Page 34 of 49

```
 1   Q.    So what was your understanding of the charges based
 2   on what he told you?
 3   A.    Just that he quite possibly was getting arrested,
 4   and he had discussed that some of the stuff -- I don't
 5   even know how to answer that.  Okay.  Just I really
 6   wasn't -- that's not who Jason is, and when he had said
 7   that he could be arrested, it really didn't matter to me
 8   because I've known him for two years since this has been
 9   pending.  So I think what he said is that there were
10   other people involved and there were drugs involved and
11   that there were the selling of drugs.  And I don't know
12   what part he played in it or to what extent.  I guess
13   that's the best I can answer it.  I'm sorry.
14   Q.    So it didn't matter to you what kind of charges he
15   was facing because you had known him for a couple years?
16   A.    You know, not really because he's been doing such a
17   good job.  He's always on time for me.  He's always so
18   caring and loving to my family.  He's always doing things
19   for other people.  So I guess we all deserve a second
20   chance, and I just -- it doesn't -- what he did in the
21   past is what he did in the past, and he's obviously
22   sitting here for a reason.  But it doesn't change how I
23   feel about him.  Does that make sense?
24   Q.    Did anything that you heard today change your
25   impression of the defendant?
```

```
 1   A.   No, huh-uh.
 2   Q.   Are you aware of the defendant's criminal history?
 3   A.   I -- yeah.  It was something about he bought goods
 4   that he didn't know were stolen.
 5   Q.   He said he bought goods that he didn't know were
 6   stolen?
 7   A.   Is that's -- yeah.
 8   Q.   Do you have any other understanding of the
 9   defendant's criminal history?
10   A.   Huh-uh.
11   Q.   You have to say yes or no.
12   A.   No, huh-uh.
13   Q.   Do you know if the defendant has ever been to jail?
14   A.   Yes.
15   Q.   Has he been to jail?
16   A.   I said yes.
17   Q.   Okay.  I just wanted to make sure my question was
18   clear there.  You have a minor son?
19   A.   I do.
20   Q.   Does he live with you?
21   A.   He does.
22   Q.   Is he in school?
23   A.   He is.
24   Q.   It's summertime now.  What is he doing?
25   A.   He's actually going to be in Harbor Springs,
```

*Contact Shelly Semmler at 712-233-3840 or ssemmlerreporting@gmail.com*
*to purchase a complete copy of this transcript.*

Case 2:23-cr-01008-LTS-MAR   Document 20-2   Filed 07/05/23   Page 36 of 49

1 Michigan, for most of the summer.

2 Q.   Will he be back in the Dubuque area at all over the

3 summer?

4 A.   He'll probably be more in our Wisconsin house.

5 Q.   Will he be back for school in the fall?

6 A.   In the fall he will be, yes.

7          MS. HAKE:  Nothing further.

8          THE WITNESS:  Thank you.

9          THE COURT:  Thank you, Ms. Hake.

10     Mr. Noel -- just a minute, Miss Figueroa.  I want to

11 make sure we're done with you.

12     Mr. Noel, anything else?

13          MR. NOEL:  No, Your Honor.

14          THE COURT:  Miss Figueroa, does Mr. Laufenberg

15 ever go to your Egg Harbor cabin without you or your

16 husband there?

17          THE WITNESS:  He doesn't, but he's welcome to.

18 But I wouldn't let him if he were released to me.  I'll

19 stick with him like glue.

20          THE COURT:  All right.  Thank you.  You may be

21 excused.

22          THE WITNESS:  Thank you.

23          THE COURT:  Any additional evidence, Mr. Noel?

24          MR. NOEL:  No, Your Honor.

25          THE COURT:  Let's proceed then with arguments.

*Contact Shelly Semmler at 712-233-3841 or ssemmlerreporting@gmail.com*
*Produced from a computer-aided copy of the transcript*
Case 2:23-cr-01008-LTS-MAR   Document 20-2   Filed 07/05/23   Page 37 of 49

1     Ms. Hake?

2         MS. HAKE:  Thank you, Your Honor.  This is a

3  rebuttable presumption case, and the defendant should be

4  detained because of risk of flight here and danger to the

5  community.  It's the government's position that the

6  defendant here has not rebutted that presumption.

7     The factors in section 3142(g) do weigh in favor of

8  detention here, really and particularly the serious

9  nature and circumstance of the offense.  The defendant

10  was involved in a massive drug-trafficking conspiracy in

11  Dubuque with very large quantities of methamphetamine

12  that flooded the Dubuque area and beyond.  Drugs are

13  poison as we know, especially methamphetamine.  And the

14  defendant was an integral component to the conspiracy.

15     If you just look at the cash alone that was dropped

16  off at the confidential informant's house, Deputy Kearney

17  testified about $300,000 dropped off, and that

18  corroborates exactly what defendant was telling other

19  people, that he was getting at least 80 pounds of

20  methamphetamine from Jacob Demaio.  We know he was

21  getting more methamphetamine from others as well.  And

22  all of that had to go somewhere.

23     It's not like this was a drug user who's middling

24  small deals who's using with a friend who's just trying

25  to make enough to get by.  This is somebody who is fully

```
 1    committed to the drug conspiracy.  The weight of the
 2    evidence is very strong here.
 3         The defendant's history and characteristics are also
 4    aggravating, especially his criminal history.  He does
 5    have several violent convictions.  There's an assault
 6    causing bodily injury.  There's also a disorderly
 7    conduct, fighting, or violent behavior.  He's got a
 8    conviction for harassing a public officer or employee
 9    that he got while he was on probation, a criminal
10    mischief charge as well.
11         And he's got a history of having issues complying
12    with court orders.  There is contempt that he got 30 days
13    in jail for back in 2013.  His deferred judgment was
14    revoked a few months later, and there he was sentenced to
15    90 days in jail, unsuccessfully discharged from probation
16    where he committed a variety of probation violations
17    including getting arrested for additional criminal
18    conduct.  There's really no reason to think that his
19    behavior under court supervision would be any different
20    now.
21         I know there was some discussion about the defendant
22    not fleeing after he received the target letter.  Of
23    course, he was not charged then.  It's very different now
24    that he does have the official indictment in place.
25         He would like to go live with Mom.  He has -- and
```

*Contact Shelly Semmler at 712-233-3846 or ssemmlerreporting@gmail.com*
*Unedited, uncertified rough draft transcript*
Case 2:23-cr-01008-LTS-MAR Document 20-2 Filed 07/05/23 Page 39 of 49

1   Mom's boyfriend.  He doesn't have any ties to La Motte,

2   Iowa, other than the eight weeks that he lived there.

3   And certainly no disrespect to his mother who came here

4   and who testified today, but she also said, "The less I

5   know the better," that she didn't want to ask questions

6   and she didn't want to know about his past and that

7   there's no reason to think that that has changed now.

8        This is a defendant who's got substance abuse

9   issues.  He's been charged in this drug case.

10       So all in all detention is really the best and only

11  option here.  There are no conditions or combination of

12  conditions that would reasonably assure the appearance of

13  the defendant and the safety of the community.  And so

14  the government requests detention.

15            THE COURT:  Thank you, Ms. Hake.

16       Mr. Noel?

17            MR. NOEL:  Thank you, Your Honor.  We would

18  respectfully disagree with the government that there

19  isn't a set or a combination of conditions that would

20  assure the safety of the community and assure that the

21  defendant would show up.

22       I disagree vehemently with the government that we're

23  in a different position now post-indictment.

24  Mr. Laufenberg knew charges were coming.  As a matter of

25  fact, he wasn't under court supervision then.  If he was

 1   going to leave, he would have left then.  To say he has

 2   no ties to La Motte, Iowa, is really focusing in on a

 3   very specific area.  La Motte, Iowa, as well as

 4   St. Donatus, Iowa, are part of the greater Dubuque area.

 5   The kids there go to Dubuque Community School District

 6   which that's where Mr. Laufenberg went.

 7        So while he does not have any ties specifically to

 8   La Motte, he's lived his whole life in the Dubuque area.

 9   He has no ties outside of that with the exception -- I do

10   believe his brother lives in Madison.  But other than

11   that, he's never had a passport.  He's never traveled

12   abroad.  There's absolutely no risk of flight.

13        And as far as danger to the community, Your Honor,

14   you heard from three witnesses today -- actually you

15   heard from four who said they have no knowledge or no

16   information that Mr. Laufenberg has been using substances

17   since at least the fall of 2021.  The government's

18   witness, although he's not intimately involved with

19   Mr. Laufenberg, did say that the last time he's even

20   heard him mentioned was in the fall of 2021.

21        What you heard in evidence today, Your Honor, is

22   evidence of somebody who has turned his life around.  And

23   I will just note that the Supreme Court has said in a

24   detention hearing liberty is the norm and detention is a

25   carefully crafted exception.  I think the Court has

```
 1   several options as the pretrial services report has noted
 2   that would ensure the defendant's appearance and safety
 3   to the community.  So with that, Your Honor, we would ask
 4   that he be released.
 5           THE COURT:  Thank you, Mr. Noel.
 6       Mr. Laufenberg, I will probably address you with
 7   most of what I need to say, but don't get the wrong idea.
 8   We're not going to have a back-and-forth here.  If
 9   Mr. Noel wanted you to talk, he would have called you to
10   testify, and I'm sure he wouldn't want you to talk at
11   this point.
12       But the reason I want to address you is I know these
13   lawyers are experts about how this all works.  But it
14   might be new and different to someone in your position.
15   I suppose one of the things that's obvious today is that
16   this is not your jury trial because we don't have a jury
17   here.
18       It's less obvious but I always think it's important
19   to mention if you go ahead and have a jury trial, that
20   jury is never going to hear anything I have to say about
21   the strength of the evidence against you or whether I
22   think you present a risk of nonappearance or a danger to
23   the community.  And that's because -- and here's the
24   important part -- you remain innocent unless and until
25   you're proven guilty by a jury.  My job is just to
```

```
 1    determine whether you should be detained until we can
 2    hold your trial.
 3        Your case is a little complicated by something
 4    called the presumption that perhaps you heard the lawyers
 5    talking about that I've always struggled to try to
 6    explain that to people who didn't go to law school.  But
 7    because you're charged with a drug offense that's
 8    punishable by more than ten years -- or ten years or more
 9    in prison, that I'm supposed to presume that you should
10    be detained unless you come forward with evidence to
11    rebut that presumption.
12        I believe you have rebutted the presumption based
13    on, well, in good part some of the testimony I heard
14    today about your ties to the community.  Unless La Motte
15    has moved in the last several decades, it's somewhere
16    between Zwingle and Bellevue.  And unless it's part of
17    the greater Maquoketa community, it's certainly part of
18    the greater Dubuque community.
19        I appreciated the people who came in here to testify
20    today.  Certainly they're people that are -- have your
21    back, and certainly that's something to be comforting to
22    you.  But it sounds like, you know, you are a hard worker
23    when you work.  I'm not surprised that a mother is here
24    to stand up for her son and provide him a place to live.
25        The work history is a little bit more of a mixed bag
```

```
 1    as far as I can tell.  Certainly Mr. Scholtes thinks
 2    you're a good employee, and I don't doubt him.  I'm sure
 3    he's glad to have you onsite.  But you haven't been
 4    working for him that long.  And it seems somewhat
 5    seasonal and sometimes you'll be there when there's work
 6    and sometimes you won't be there.
 7        What I take from most of the other testimony I heard
 8    today is that seems likely you've been supporting
 9    yourself in the drug trade over the last several years.
10        So even if you've rebutted the presumption, I need
11    to consider all the factors that the lawyers have been
12    talking about today.  The first is the nature and
13    circumstances of the offense charged including whether
14    the crime involved violence or a firearm, and I'm glad to
15    say it doesn't appear to involve violence or a firearm.
16        But the nature and circumstances of the offense
17    charged are quite remarkably troubling.  We're here
18    talking about enormous amounts of methamphetamine, pounds
19    and pounds and pounds of methamphetamine, that you
20    distributed to others, that you were involved in giving
21    to other distributors.  And it is a very dangerous and
22    addictive drug.
23        In terms of the weight of the evidence against you,
24    I find that the weight of the evidence against you is
25    very strong.  Now, again, the jury's not going to hear
```

Case 2:23-cr-01008-LTS-MAR   Document 202-2   Filed 07/05/23   Page 44 of 49

 1    what I have to say about that.  But for the purposes of

 2    our hearing today, I find that the weight of the evidence

 3    against you is strong.

 4         Turning to your history and characteristics, some of

 5    which I have touched on, you've been a resident of the

 6    Dubuque and surrounding communities for a long time.

 7    You've got a lot of family ties in the general area.  You

 8    do have some release plans, and certainly it is generous

 9    of both your mother and Miss Figueroa to provide those

10    places.

11         My concern that, you know, you being a 38-year-old

12    man who hasn't lived with your mother on a full-time

13    basis for probably more than 20 years is to think that

14    she who has probably for her own good reasons kept her

15    nose out of your business might not be in a position to

16    provide you much supervision there.

17         And Miss Figueroa who has known you for, oh,

18    approximately two years mostly on a basis related to some

19    work you've done for her, I'm not confident that that's a

20    great custody arrangement either.

21         I've talked some about your education, employment,

22    financial resources, mostly your employment history.  I

23    don't need to touch on that any more.

24         I'm not sure what to make of your substance abuse

25    history.  More power to anybody who achieves sobriety

*Contact Shelly Semmler at 712-233-3846 or ssemmlerreporting@gmail.com*
Case 2:23-cr-01008-LTS-MAR   Document 20-2   Filed 07/05/23   Page 45 of 49
*Produced through official Court Transcriber*

```
1    from methamphetamine on his own if that's what happened.
2    That's quite remarkable, especially for someone who is
3    apparently involved in dealing it.  So either you're not
4    coming clean about what your problem is which, you know,
5    I'm not accusing you of that.  Again, more power to you
6    if you did that.  But then someone who did that who has
7    ongoing involvement in the drug trade, that really makes
8    me worry about what a danger you pose to the community if
9    you were to be released.
10        Your criminal history as we sometimes say in this
11   court -- and I'm not sure it's great endorsement, but
12   it's not as bad as what we often see.  I think one thing
13   that's worth remarking here is that there is a charge in
14   2021 that was dismissed, and I won't count that one as
15   against you.  But most of this criminal behavior is at
16   least ten years old.
17        Given what we've heard about the conspiracy that
18   you're charged with here and the fact your name came up
19   in some prior investigations, I have, as I've said, some
20   concern about your involvement in the drug trade and
21   either you managed to avoid detection or it didn't
22   happen.  I'm not sure what to make of that.
23        You know, the one thing that is nagging at me in
24   your case that makes this difficult for me are these
25   enormous quantities of cash that you were dealing with,
```

1    at least $300,000.  The piece of evidence about one of

2    your persons involved in the co-conspiracy who took a

3    large quantity of cash and blew it in Las Vegas makes me

4    sort of suspicious about what sort of cash may be lying

5    about unaccounted for and might increase the risk that

6    you are a risk of nonappearance in this case.  I know

7    that's a bit of a slender reed to stand on with respect

8    to that, but I will tell you honestly that does cause me

9    some concern about your risk of nonappearance.

10         So though I find the government has -- I'm sorry,

11   the defendant has rebutted the presumption against

12   detention, based on the totality of the evidence before

13   me, I find the government has carried its burden of

14   showing by a preponderance of the evidence that the

15   defendant poses a risk of nonappearance and by clear and

16   convincing evidence that he poses a danger to the

17   community.

18         I conclude there's no condition or combination of

19   conditions I could impose with which the defendant would

20   comply and appear as required at the trial and hearings

21   in this matter and that would ensure the safety of the

22   community.  I, therefore, order the defendant be

23   committed to the custody of the attorney general of the

24   United States until trial in this matter.

25         Mr. Laufenberg, you don't have to agree with my

1  decision today.  In fact, you have a right to appeal it

2  to the district court judge who's assigned to this case.

3  You have 14 days to file such an appeal if you talk about

4  that with Mr. Noel and you choose to pursue it.  Do you

5  understand your right to appeal my decision?

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  Is there anything further on behalf

8  of the United States?

9          MS. HAKE:  No, Your Honor.

10          THE COURT:  Anything further on behalf of

11  Mr. Laufenberg?

12          MR. NOEL:  No, Your Honor.

13          THE COURT:  All right.  Thank you all.  That

14  will conclude our hearing.

15               (The foregoing hearing was

16               concluded at 2:27 p.m.)

17                        *  *  *  *

18    (This concludes the transcript of the audio recording.)

19

20                    CERTIFICATE

21      I certify that the foregoing is a correct

22  transcript to the best of my ability from the digital

23  recording of proceedings in the above-entitled matter.

24      S/Shelly Semmler                6-29-23
       Shelly Semmler, RDR, CRR           Date

25

<b><u>INDEX</u></b>

**<u>WITNESS</u>:**                                                      **<u>PAGE</u>:**

  DAN KEARNEY
              DIRECT EXAMINATION                        3
              BY MS. HAKE
              CROSS-EXAMINATION                        11
              BY MR. NOEL

  DEBBIE LAUFENBERG
              DIRECT EXAMINATION                       14
              BY MR. NOEL
              CROSS-EXAMINATION                        16
              BY MS. HAKE
              REDIRECT EXAMINATION                     21
              BY MR. NOEL

  MARK SCHOLTES
              DIRECT EXAMINATION                       24
              BY MR. NOEL
              CROSS-EXAMINATION                        26
              BY MS. HAKE

  WENDY FIGUEROA
              DIRECT EXAMINATION                       29
              BY MR. NOEL
              CROSS-EXAMINATION                        33
              BY MS. HAKE

* * * * *